*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re SWAY, Minors.

UNPUBLISHED
May 16, 2024

Nos. 365452; 365454
Livingston Circuit Court
Family Division
LC No. 20-016129-NA

In re E. SWAY, Minor.

No. 365455
Livingston Circuit Court
Family Division
LC No. 20-016130-NA

Before: JANSEN, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals by right, respondent-father, A. Sway, and respondent-mother, J. Curry, appeal the trial court's termination of their parental rights to their two minor children, LS and AS, and respondent-father also appeals the termination of his parental rights to another child, ES.[1] The court terminated respondent-mother's parental rights to LS and AS, and terminated respondent-father's parental rights to all of the children under MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm in each appeal.

## I. FACTUAL AND PROCEDURAL HISTORY

Respondents have a history with Children's Protective Services ("CPS") dating back to early 2017. In 2019 and 2020, CPS investigated complaints against both respondents regarding the care of the three children. Respondents were offered numerous in-home services and assistance during this time period without court involvement. Because petitioner concluded that respondents

---

[1] ES's mother, J. Schnittker, was also a respondent in these proceedings, but did not have her parental rights terminated.

showed little benefit from these services, petitioner filed a formal petition for court jurisdiction in March 2020 and the children were removed from respondents' care. Following an adjudication trial in November 2020, the trial court found that a preponderance of the evidence established its jurisdiction over the children pursuant to MCL 712A.2(b)(1) and (2).

Petitioner provided respondents with treatment plans designed to address the barriers to reunification. Although respondents participated in additional services, petitioner determined that they failed to demonstrate substantial benefit from the services. Accordingly, in April 2022, petitioner filed a supplemental petition alleging that respondents failed to sufficiently benefit from the services provided and requesting termination of their parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j).

The trial court conducted a three-day termination hearing that spanned from July 8, 2022 to October 3, 2022. On February 14, 2023, the court issued an opinion and order finding that clear and convincing evidence supported termination of respondent-mother's parental rights to LS and AS, and supported termination of respondent-father's parental rights to all three children, pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). Additionally, the court found that termination of respondents' parental rights was in the children's best interests. Respondents now appeal.

## II. REASONABLE EFFORTS

Both respondents argue that petitioner failed to make reasonable efforts toward reunification.

Because child protective proceedings constitute a single continuous proceeding, a respondent has multiple opportunities to object to the adequacy of the services throughout the case. *In re Atchley*, 341 Mich App 332, 337-338; 990 NW2d 685 (2022). But "[i]n order to preserve an argument that petitioner failed to provide adequate services, the respondent must object or indicate that the services provided to them were somehow inadequate." *Id*. at 336 (quotation marks and citation omitted). Respondent-father preserved this issue by asking the foster care supervisor, Amy Crabtree, for additional parenting classes. However, the record does not disclose that respondent-mother challenged the adequacy of services in the trial court, thereby failing to preserve this issue.

This Court generally reviews for clear error a trial court's factual finding that petitioner made reasonable efforts to reunify a respondent with the child. *Id.* at 338. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). However, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019). To be entitled to appellate relief, respondent "must establish that (1) error occurred; (2) the error was 'plain,' i.e., clear or obvious; and (3) the plain error affected [his] substantial rights." *Id*. Further, the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings[] . . . ." *Id*., quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (quotation marks omitted).

Petitioner "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637

(2017), citing MCL 712A.19a(2). In order to meet this duty, petitioner "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Atchley*, 341 Mich App at 338-339 (quotation marks and citation omitted). Although petitioner has a responsibility to provide services and make reasonable efforts toward the reunification of the family, respondents also have a responsibility to participate in the services. *Id.* at 339. "This means a respondent-parent must both participate in services and demonstrate that they sufficiently benefited from the services provided." *Id.* (quotation marks and citation omitted).

Before the children were even removed from respondent-father's care, petitioner had provided an extensive array of in-home services. Kate Fox implemented the Parent Infant Program, which centered around the whole household, to support and strengthen primary attachment relationships between respondents and the children. Cali Montrull implemented the Families First Program, which was a 28-day intensive in-home program that was geared toward more practical concerns, such as nonphysical discipline, safe sleep, potty training for ES, meeting the children's basic needs, and cleaning the house. Bayley Bauchan spent 10 hours a week for four weeks in respondents' home focused on feeding LS, mental health, safe sleep, and following through with medical appointments for all members of the family. Mary LaLonde from LACASA worked with respondents for more than a year to help them address the children's basic needs and keep the home clean and safe for the children.

After the children were removed and the court exercised jurisdiction, a formal parent-agency treatment plan was created and services were provided for respondents. With regard to respondent-father, the primary barriers to reunification identified in the initial treatment plan were parenting skills, domestic violence, and mental health. Respondent-father was referred for a psychological evaluation, which was completed by Dr. Douglas Ruben, a clinical forensic psychologist, on July 22, 2020. Dr. Ruben recommended outpatient therapy and supervised visitation. Dr. Ruben also cautioned respondent-father against entering into any new relationships because he should be focusing on building his relationship with his children. Crabtree referred respondent-father to parenting classes, supportive visitation, and a Domestic Abuse Intervention Program ("DAIP") program. Crabtree also issued a referral for individual counseling at Advanced Counseling in late December 2020, but Advanced Counseling could not accommodate respondent-father's work schedule. Crabtree regularly worked with respondent-father to engage in counseling and respondent-father finally began counseling at the Ennis Center for Children in August 2021.

Respondent-father was referred to DAIP, which focused on abuse and healthy and unhealthy behaviors. Breanne Passalacqua, who ran the DAIP program, learned that respondent-father might be suffering from post-traumatic stress disorder. Passalacqua was also trained in cognitive processing therapy ("CPT") and offered a 12-week CPT program to respondent-father in March 2022. Respondent-father only completed three of the CPT sessions. Passalacqua believed that respondent-father had been evicted from the CPT program, which was not a priority for him. Fox, an infant and early childhood therapist, began consistently providing therapy for ES in February 2020. Despite encouragement from Fox and Crabtree, respondent-father only participated in therapy from January to March 2022.

Respondent-father argues that he tried to engage in additional services, but Crabtree told him that he would not benefit from additional services and that it was not worth his effort because

the supplemental petition for termination had already been filed. Respondent-father also asserts that his therapist, Robert Ennis, testified that he felt that petitioner abandoned respondent-father and his problems rather than helping him work through his problems. Respondent-father testified that when he asked Crabtree about the Father's Only class, she told him that the class, which started in April 2022, would be too late for him to attend because the supplemental petition for termination would be filed. Crabtree testified that respondent-father asked her about the Father's Only class at LACASA, but that class would not be available for another six months.

The trial court did not clearly err by finding that petitioner made reasonable efforts by offering numerous services to assist respondent-father with reunification. The initial petition was filed because respondents were not benefiting from all of the in-home services that were provided. After the court assumed jurisdiction over the children, petitioner created a treatment plan that was designed to address the barriers to reunification and it referred respondent-father to many services that were chosen to rectify the conditions that brought the children into care. While respondent-father consistently engaged in the services, he failed to demonstrate that he sufficiently benefited from them.

Although respondent-father's therapist, Ennis, believed that respondent-father was benefiting from therapy, he agreed that respondent-father's progress was not as far along as he would have expected. Ennis did not doubt that respondent-father loved his children and he was not concerned about respondent-father abusing them. However, Ennis did not believe that respondent-father would be in a position to parent his children without intensive in-home services for another two or three months. Ennis had previously expressed his opinion in December 2021 that respondent-father would be able to be an appropriate parent within six months, but Ennis later agreed in July 2022 that respondent-father was not yet in a position to care for the children, who at that point had been in care for more than two years. Considering the many services that petitioner had provided to respondent-father and that respondent-father still was not in a position to care for his children more than two years later, the trial court did not clearly err by finding that petitioner made reasonable efforts to reunify respondent-father with his children, and that respondent-father failed to demonstrate that he sufficiently benefited from those efforts.

With respect to respondent-mother, she argues that petitioner failed to make reasonable efforts at reunification because she was not offered parenting classes or supportive visitation to improve her parenting skills and petitioner did not accommodate her cognitive deficits. Petitioner's reasonable efforts must also comply with the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, which requires petitioner to "modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks/Brown*, 500 Mich at 86. Although petitioner "cannot accommodate a disability of which it is unaware," *id.* at 87, the obligation to make accommodations under the ADA extends to providing reasonable accommodations to "a parent with a known or suspected intellectual, cognitive, or developmental impairment," *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021) (quotation marks, citation, and emphasis omitted). Petitioner's affirmative duty to use reasonable efforts means that petitioner cannot be "passive" in its approach to providing accommodations. *In re Hicks/Brown*, 500 Mich at 87-88.

Petitioner offered respondent-mother supportive visitation, which respondent-mother completed in 2021. Crabtree testified that the only other parenting program available was a

classroom-based parenting class, but Crabtree did not believe this would be helpful for respondent-mother because of her cognitive deficits. Jaclyn Lott, a program coordinator and therapist with Livingston County Community Mental Health, referred respondent-mother for a speech assessment, which determined that respondent-mother had severe receptive and expressive language deficits. Respondent-mother was referred to speech therapy and Lott noticed an improvement. Crabtree created the initial service plan in a simpler form to facilitate respondent-mother's understanding of the plan and Crabtree carefully reviewed the plan with respondent-mother. The record discloses that the workers made affirmative efforts to tailor services to accommodate respondent-mother's cognitive limitations. Accordingly, the trial court did not err by determining that petitioner made reasonable efforts to reunify respondent-mother with her children.

## III. STATUTORY GROUNDS FOR TERMINATION

Both respondents argue that the trial court erred by finding that statutory grounds for termination were established by clear and convincing evidence.

To terminate parental rights, the trial court must find that at least one statutory ground under MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). We review for clear error a trial court's finding whether a statutory ground for termination has been proved by clear and convincing evidence. MCR 3.977(K). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Atchley*, 341 Mich App at 338 (quotation marks and citation omitted); see also *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated the parental rights of both respondents under MCL 712A.19b(3)(c)(*i*), (g), and (j), which permit termination of parental rights under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> \* \* \*

-5-

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The conditions that led to the adjudication with respect to respondent-father were significant concerns regarding his ability to meet the children's basic needs after months of intensive in-home services. There was evidence that respondent-father had problems meeting basic needs, such as bodily cleanliness, diaper changes, and proper meal times. Respondent-father struggled to timely change ES's diapers and to help ES learn to use the toilet. ES was often locked in her room for hours without any parental interaction, diaper changes, or meals. In fact, ES would change her own diaper and leave them lying in her room, leaving feces on her toys and the carpet. When service providers were in the home, they had to prompt respondent-father to feed and change ES and AS. After LS was born, the pediatrician became very concerned that LS was not only failing to gain weight, but losing weight. Moreover, there were concerns that respondent-father was not properly following the pediatrician's directions on how and what to feed LS. Additionally, there was evidence that respondent-father exerted control over respondent-mother and that respondent-father had a pattern of partnering with young vulnerable woman whom respondent-father could manipulate and control.

These conditions continued to exist more than two years later and, considering respondent-father's lack of progress during this period, they were not reasonably likely to be rectified within a reasonable time considering the children's ages. While petitioner offered respondent-father individual counseling, DAIP and CPT services, and supportive visitation, respondent-father failed to benefit from the services. Ennis, who had the most positive outlook for respondent-father's potential, did not believe that respondent-father would be able to properly care for the children for another two or three months, and only with the help of in-home services, which had not been successful in the past. In his last letter to the trial court before the termination hearing, Ennis stated that respondent-father continued to engage in relationships with significantly younger women, whose immaturity caused issues within the relationship that ultimately affected the children. Indeed, at the termination hearing on August 11, 2022, respondent-father was accompanied by Rosemarie Carroll, who was approximately 20 years younger than respondent-father and had pleaded guilty to third-degree criminal sexual conduct. Respondent-father had also taken Carroll with him to a visitation with his children. As Ennis predicted, respondent-father had chosen a relationship with another young woman, which ultimately affected his children by contributing to the reasons that supported termination. Considering this evidence, the trial court did not clearly err by finding that respondent-father had not rectified the conditions that led to the adjudication and would not reasonably be able to do so within a reasonable time considering the children's ages.

There was also clear and convincing evidence that respondent-father, although financially able to do so, failed to provide proper care or custody for his children and there was no reasonable expectation that he would be able to do so within a reasonable period of time considering the children's ages. Crabtree testified that although respondent-father frequently changed employment, he was consistently employed throughout the case. There was no evidence that respondent-father could not financially care for his children.

The children were removed from the home after respondent-father had received various in-home services to assist respondents in properly caring for their children. At the adjudication trial, Dr. Ruben testified that respondent-father had a tendency to partner with individuals who had educational or emotional deficits. As a result of this tendency, respondent-father became entrapped in situations where people depended on him very quickly. Montrull testified at the adjudication trial that respondent-father was very controlling and did everything in the home. He installed cameras in the home to watch respondent-mother while he was at work, and kept respondent-mother's card for her social security disability benefits, to which respondent-mother did not have access or knowledge as to how much social security income she received.

This pattern of behavior continued through the termination hearings. In November 2021, soon after respondent-father and respondent-mother separated, respondent-father began a new relationship with a female who was 18 or 19 years old. The person became pregnant, but respondent-father was not sure if the child was his. Before respondent-father ended his relationship with this young woman, he allowed Carroll to move into the residence that he was sharing with this other woman.

At the termination hearing, Ennis thought that respondent-father needed two or three more months with in-home services before he would be able to adequately parent his children. However, respondent-father's behavior had remained the same since the beginning of the case. While the evidence clearly showed that respondent-father loved his children and shared a bond with them, clear and convincing evidence supports the trial court's finding that there was no reasonable expectation that respondent-father would be able to provide proper care and custody for his children within a reasonable time considering the children's ages.

The trial court did not clearly err when it found that clear and convincing evidence supported termination under MCL 712A.19b(3)(j). "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *In re Sanborn*, 337 Mich App at 279. Failure to benefit from services may be considered as evidence that a child may be harmed if returned to her parent's care. *Id*. at 279-280. The evidence supported a finding that respondent-father failed to benefit from the services that petitioner offered. Dr. Ruben evaluated respondent-father early in the proceedings and concluded that he tended to enter relationships with young, vulnerable women, which led to him becoming entrapped in situations where people became dependent on him very quickly. This opinion was factually supported by respondent-father's relationship with respondent-mother, who depended on respondent-father for everything. Many of the service providers testified that respondent-mother looked to respondent-father to answer questions and for help. This led to a situation where the children were neglected when respondent-father left for work because respondent-mother was too overwhelmed to care for them. When respondent-father left his employment to help respondent-mother care for the children, the family did not have enough money for food, formula, and diapers. Respondent-father continued this pattern of entering into relationships with younger, vulnerable women throughout the case, which contributed to the physical and emotional neglect of the children. Although respondent-father participated in a number of services throughout the case, he did not demonstrate that he understood how his actions affected or harmed his children. Adding to that lack of understanding or progress was the evidence that, at the time of the termination hearing, respondent-father was in a relationship with another young woman who had a criminal history of third-degree criminal sexual

conduct. The evidence supports the trial court's finding that termination pursuant to MCL 712A.19b(3)(j) was warranted.

Although the trial court found that the evidence also supported termination of respondent-mother's parental rights under MCL 712A.b(3)(c)(*i*), (g), and (j), respondent-mother only challenges the termination of her parental rights under §§ 19b(3)(c)(*i*) and (g). Only one statutory ground for termination is necessary to support termination of parental rights. *In re Gonzales/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015). Where a respondent does not challenge a trial court's determination as to one or more of several statutory grounds, this Court may assume that the trial court did not clearly err by finding that the unchallenged grounds were proved by clear and convincing evidence. *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich 341, 353; 612 NW2d 407 (2000).

In any event, there was clear and convincing evidence to support termination of respondent-mother's parental rights pursuant to MCL 712A.b(3)(c)(*i*), (g), and (j). Respondent-mother was entirely dependent on respondent-father when the family first became involved with CPS. Respondent-father worked while respondent-mother took care of ES, who was not her child, in addition to caring for AS, and later LS. Respondent-father installed cameras in the home to monitor respondent-mother's actions with the children. From the descriptions of the conditions of the home by all of the workers who provided services in the home, the home was generally in an unsafe and unsanitary condition. Respondent-mother had to be reminded to feed the children and to change their diapers. When LS was born, she quickly lost weight because respondent-mother did not feed her regularly and did not follow the pediatrician's orders for feeding.

After the children were removed from respondents' care and respondent-mother and respondent-father ended their relationship, respondent-mother was left homeless. It took respondent-mother the length of the case to find employment and appropriate housing. Although respondent-mother benefited from services to the extent that she was able to adequately care for herself, she was not able to demonstrate sufficient benefit to be able to properly care for her children on her own.

While there was evidence that respondent-mother loved her children and was bonded with them, respondent-mother did not act as a parent when she visited with the children. Crabtree observed that respondent-mother did not follow through with any discipline and never denied the children anything they wanted to do or have. Respondent-mother looked to the parenting-time supervisor for guidance and to parent the children. Respondent-mother had never cared for AS and LS on her own. Crabtree did not believe that respondent-mother had sufficiently benefited from services to properly care for her children and had not recommended unsupervised parenting time for respondent-mother. Crabtree acknowledged respondent-mother's improvement and achievements, but did not believe that respondent-mother could provide proper care and custody for the children.

Considering the many services that petitioner provided for respondent-mother and respondent-mother's limited progress after participating in those services, the trial court did not clearly err by finding that the statutory bases for termination were proved by clear and convincing evidence.

## IV. BEST INTERESTS

Respondents argue that the trial court erred by finding that termination of their parental rights was in the children's best interests.

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. We review for clear error the trial court's findings regarding a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

The trial court must terminate a parent's rights to a child if the petitioner establishes a statutory ground for termination by clear and convincing evidence and a preponderance of the evidence on the whole record demonstrates that termination of parental rights is in the child's best interests. MCL 712A.19b(5). As explained in *In re White*, 303 Mich App at 713-714:

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [Citations omitted.]

A trial court must also "explicitly address whether termination is appropriate in light of the children's placement with relatives." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016) (quotation marks and citation omitted).

There was evidence that respondent-father loved his children and shared a bond with them. However, there was also testimony that after receiving services for more than three years, respondent-father still was not able to properly care for his children. The testimony at trial established that respondent-father's lifestyle lacked permanence and stability. He had been evicted from his home twice during the proceedings and was living in a motel on the second date of the termination hearing. During respondent-father's testimony, he admitted that he had just started another job. Respondent-father also continued his cycle of quickly entering into relationships with younger, vulnerable women, which impacted his children. The evidence clearly demonstrated that despite receiving services for more than three years, respondent-father was still unable to provide a stable home for his children. Although Ennis was supportive of respondent-father, he did not believe that respondent-father was ready to take custody of the children and that, once he did, he would still need in-home services to assist him. There was evidence that AS and LS were thriving in foster care and ES was doing well in Schnittker's care.

Father argues that termination of his parental rights to ES was not in that child's best interests considering her relative placement with her mother, Schnittker. Although the trial court stated that ES's placement with Schnittker did not qualify as relative placement because a

biological mother is not a "relative" for purposes of MCL 712A.19a, the court was relying on the definition of relative in MCL 712A.13a(1)(j), before that statute was amended by 2022 PA 200, effective October 7, 2022. See *In re Schadler*, 315 Mich App at 413 (a biological mother is not a "relative" as defined by former MCL 712A.13a(1)(j) for purposes of MCL 712A.19a). As amended, however, the statute now provides that a "relative" is any "individual who is at least 18 years of age and is . . .[r]elated to the child within the fifth degree by blood, marriage, or adoption," MCL 712A.13a(1)(j)(*i*), which would include a child's biological mother. The trial court entered its order more than four months after the statute was amended to include a biological mother within the definition of a relative.

Regardless, the trial court found that termination of respondent-father's parental rights to ES was in the child's best interests despite the child's placement with her mother. The court stated:

> While [ES] is currently placed with a parent, it nonetheless remains in her best interest to terminate the rights of [respondent-father]. He has clearly failed to benefit from services and has continued to display the same damaging and controlling behavior throughout the case. This has resulted in safety concerns for the children as well as RM Schnittker. At this juncture, an order through the Friend of the Court is not the appropriate remedy to provide permanency for [ES]. There are significant concerns [respondent-father] would subject both RM Schnittker and [ES] to the power and control dynamics that caused the children trauma and was a substantial reason for removal. . . . Ms. Crabtree testified she has concerns regarding [ES's] safety and well-being should the Court decline to terminate [respondent-father's] parental rights even though she is placed with a parent.

A preponderance of the evidence supports the trial court's finding that termination of respondent-father's parental rights was in ES's best interests, despite her placement with her mother, to ensure the continued safety of both ES and her mother.

Considering the foregoing evidence, the trial court did not clearly err by finding that termination of respondent-father's parental rights was in the children's best interests.

After two years of services, respondent-mother was able to gain steady employment and appropriate housing and furniture. However, it took almost the entirety of the case for respondent-mother to establish these basic requirements for herself after being entirely dependent on respondent-father for all of her needs. Respondent-mother still needed more time to achieve a position that would allow her to provide proper care and custody for her children. Since the children were removed from respondent-mother's care, she had not cared for them without supervision. During supervised visitation, respondent-mother played and visited with the children, but looked to a supervisor to discipline and parent the children.

Crabtree testified that respondent-mother did not have much of a support system and relied on her parents for transportation. However, Crabtree had concerns about respondent-mother relying on her parents for help because respondent-mother had been abused by them as a child. The evidence established that respondent-mother had sufficiently addressed her own needs for income and housing, but she needed more time to establish that she could meet her children's basic needs. The children's need for permanency and stability is an important consideration when

determining a child's best interests. *In re Olive/Metts*, 297 Mich App at 42. AS and LS had been in care since March 2020 and were in need of permanency and stability in their lives. Considering that respondent-mother had not yet had unsupervised parenting time with the children and had never independently cared for them, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the children's best interests.

## V. DELAY OF PROCEEDINGS

Respondent-father argues that the trial court's failure to comply with various time requirements for holding the termination hearing and issuing a final order requires reversal.

Because respondent-father did not object to any delay or otherwise raise this issue before the trial court, this issue is unpreserved. *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). We review de novo issues involving the interpretation of statutes and court rules. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). However, unpreserved issues in child protection proceedings are reviewed for plain error affecting substantial rights. See *In re Ferranti*, 504 Mich at 29.

MCR 3.977(H)(1)(b) requires that a hearing on a supplemental petition for termination of parental rights be held within 42 days after the filing of the supplemental petition, subject to extension for a 21-day period for good cause shown. The supplemental petition was filed on April 28, 2022, but the termination hearing did not begin until July 8, 2022, and the last day of the hearing was held on October 3, 2022. Accordingly, the time period prescribed in MCR 3.977(H)(1)(b) was not met.

Further, MCL 712A.19b(1) provides, in pertinent part:

> The court shall issue an opinion or order regarding a petition for termination of parental rights within 70 days after the commencement of the initial hearing on the petition. The court's failure to issue an opinion within 70 days does not dismiss the petition.

Similarly, MCR 3.977(I)(1) provides:

> The court shall state on the record or in writing its findings of fact and conclusions of law. Brief, definite, and pertinent findings and conclusions on contested matters are sufficient. If the court does not issue a decision on the record following hearing, it shall file its decision within 28 days after the taking of final proofs, but no later than 70 days after the commencement of the hearing to terminate parental rights.

The termination hearing concluded on October 3, 2022, but the trial court did not enter a decision until February 14, 2023, which was more than 28 days after taking final proofs and more than 70 days after the commencement of the termination hearing.

Although the trial court's failure to comply with applicable time requirements qualifies as plain error, this Court has repeatedly held that a failure to comply with the time requirements in the statute and court rule does not require dismissal or other appellate relief. See *In re TC*, 251

-11-

Mich App 368, 370-371; 650 NW2d 698 (2002), and cases cited therein. The statute expressly states that a trial court's failure to issue a final order within 70 days does not require dismissal of the petition, and neither the court rule nor the statute set forth any sanctions for a violation. This Court reasoned in *In re TC* that "[t]here is no reason to suppose that the Supreme Court intended that the penalty for delay would be more delay." *Id*. at 371. This Court further noted that, pursuant to MCR 5.902(A), "[l]imitations on corrections of error are governed by MCR 2.613," which provides that

> an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgement or order, unless refusal to take this action appears to the court inconsistent with substantial justice. [*In re TC*, 251 Mich App at 371.]

Accordingly, respondent-father is not entitled to appellate relief with respect to this issue.

Affirmed.

/s/ Kathleen Jansen
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien